Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MICHAEL JOHNSON and SEAN JOHNSON, <br><br> Plaintiffs, <br><br> vs. <br><br> DESERET MUTUAL BENEFIT ADMINISTRATORS, and the DESERET VALUE PLAN <br><br> Defendants. | COMPLAINT <br><br> Case No. 2:22-cv-00330 - DBB |

Plaintiffs Michael Johnson ("Michael"), and Sean Johnson ("Sean"), through their undersigned counsel, complain and allege against Defendants Deseret Mutual Benefit Administrators ("DMBA") and the Deseret Value Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Michael and Sean are natural persons residing in Salt Lake County, Utah. Michael is Sean's father.

2. DMBA is an insurance company which primarily provides and administers benefits for employees of the Church of Jesus Christ of Latter-Day Saints and the various

1

corporations and entities which are owned or affiliated with it. DMBA acted as the claims administrator, as well as the fiduciary under ERISA, for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Michael was a participant in the Plan and Sean was a beneficiary of the Plan at all relevant times. Michael and Sean continue to be participants and beneficiaries of the Plan.

4. Sean suffers from a debilitating condition called Spinal Muscular Atrophy Type II. Sean's treatment team recommended that his wheelchair be outfitted with a particular robotic arm attachment and identified this as the medically necessary course of treatment for his condition.

5. While DMBA and the Plan offer coverage for devices such as the Jaco robotic arm recommended for the treatment of Sean's condition, after Sean attempted to procure this device on the recommendation of his treatment team, DMBA denied payment for Sean's robotic arm.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because DMBA does business in Utah, and the Plaintiffs reside in Utah. In addition, venue in Utah will save the Plaintiffs costs in litigating this case.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, an order for DMBA and the Plan to provide

coverage for the Jaco robotic arm recommended by Sean's treatment team, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

9. Sean suffers from a condition called Spinal Muscular Atrophy, Type II. This condition leaves him with severe weakness in his core and extremities. He cannot lift his arms but does have limited finger and hand function.

10. Sean's treatment team recommended that he receive the Jaco robotic arm in order to help mitigate the effects of his condition. The arm attaches to the wheelchair and greatly improves the independence and quality of life for the user. Sean's treatment team stated that it was a medically necessary treatment intervention and was the most effective and least expensive intervention for his condition. In addition, the independence it granted him would also help prevent him from developing other potentially serious health problems.

11. On February 11, 2021, DMBA denied payment for Sean's robotic arm. The letter gave the following justification for the denial:

> After carefully considering the documentation from you and your provider(s) in conjunction with the terms of the Deseret Value Plan (the "Plan"), DMBA has determined the requested services are not covered by the Plan for reasons set out below.
>
> You can find the provision(s) on which the denial was based in the 2021 Deseret Value summary plan description on page(s) 7 under the heading Wheelchairs and Scooters within the Exclusions section. You can also access this information online by logging into your account at www.dmba.com and selecting the appropriate summary plan description under the *My Plans* dropdown menu.
>
> The cited provision(s) states: Not a medically necessary benefit.

12. On March 3, 2021, Doctor of Physical Therapy Amelia Wilson, submitted an appeal on Sean's behalf. Dr. Wilson recommended that Sean be outfitted with a Jaco robotic arm in order to combat his diagnosis of Spinal Muscular Atrophy, Type II.

13. Dr. Wilson wrote that Sean's illness was progressive and had left him with severe weakness in his trunk and extremities and an inability to lift his arms and with minimal function of his fingers and hands. She stated that without the robotic arm Sean was unable to brush his teeth, reach for food and drink, open a door in his home in an emergency, or even to relieve pressure on a body part.

14. She stated that with the Jaco robotic arm Sean would be able to perform these functions and to ameliorate much of the pain and dysfunction he experienced due to his disability. She opined that Sean did not have the capacity to utilize more traditional supports like a mobile arm support and they would not allow him to perform even a fraction of the tasks that he otherwise could with the Jaco robotic arm.

15. She wrote that this robotic arm was medically necessary and was not recommended for Sean's convenience or comfort. She argued that if Sean was provided with this robotic arm then he would be at a lower risk for many medical complications such as respiratory disease, kidney disease, dehydration, and pressure injuries.

16. Dr. Wilson stated that the use of the Jaco robotic arm would significantly affect all areas of his health both physically and mentally, however without the arm he would remain dependent in many areas. She stated that the arm was appropriate in type, frequency, extent, site, and duration and was clinically appropriate for Sean and his specific diagnosis.

17. In a letter dated April 1, 2021, DMBA upheld the denial of payment for Sean's robotic arm. The letter quoted the Plan's definition of medically necessary, the exclusions section of the Wheelchair/Scooter portion of the insurance policy, and then gave the following justification for the denial:

> While DMBA has carefully reviewed all of the information submitted to date, DMBA has determined that the requested "JACO ROBOTIC ARM" (HCPCS code E1399), "LIFT ARM" (HCPCS code K0108), and "CONTROLLER ACTIVATED SWITCH" (HCPCS code K0108) are not medically necessary as defined by the plan, and are primarily convenience items. Specifically, the requested miscellaneous durable medical equipment and wheelchair accessories do not appear to be "the most appropriate level of Service"; appear to be "primarily for the convenience of the Covered Individual or his or her Physician or other Provider"; do not appear to "be appropriate and needed for a legitimate diagnosis or a cost-effective treatment of a Condition"; and appear to "be significantly more costly than an alternative Service or sequence of Services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the Covered Individual's Condition or Injury." These are all components of the plan definition of *Medically Necessary,* and durable medical equipment that is determined to be not medically necessary or primarily for the convenience of the covered individual, physician, or other provider would fall under exclusions 6.2, 11.1, and 11.2 of the Plan.
>
> Further, DMBA's *Wheelchair/Scooter Policy* precludes coverage of "a wheelchair accessory/attachment… needed to adapt to the outside environment for convenience, work, or to perform leisure or recreational activities." DMBA has determined, based upon all the information submitted to date, that the requested "JACO ROBOTIC ARM" (HCPCS code E1399), "LIFT ARM" (HCPCS code K0108) and "CONTROLLER ACTIVATED SWITCH" (HCPCS code K0108) are being used to "adapt to the outside environment for convenience… or to perform leisure or recreational activities," and as such the requested durable medical equipment would also be ineligible consistent with the *Preauthorization* guidelines of the Plan.

18. On April 12, 2021, Sean submitted a level two appeal of the denial of payment for the Jaco robotic arm. Sean contended that DMBA's denial rationale which stated that the arm was for the purposes of convenience, work, leisure, or recreation did not adequately reflect why he was seeking the arm and made him doubt that his appeal request had been sufficiently reviewed.

19. He reiterated that there were many medically necessary tasks that the Jaco robotic arm would allow him to perform. The following are excerpts of the examples he offered showing some of the things he would be able to do with the arm:

    - I can exit a room or building in case of an emergency or if my caregiver is not available or incapacitated.
    - I can adjust my limbs to help prevent a pressure sore.
    - I can regulate my own temperature which will prevent hypothermia and hyperthermia.
    - I can hydrate on my own preventing medical complications that can lead to hospitalization.
    - I can manage my own nutrition and prevent aspiration.
    - I can brush my teeth, maintaining my oral hygiene and subsequently my heart health.
    - Complete grooming/oral hygiene. Proper hygiene is required to minimize risk for me experiencing respiratory infections, kidney disease and other medical complications.
    - Operating elevators and accessible doorways.

20. Sean wrote that none of these tasks were for convenience, work, leisure, or recreation. He argued that DMBA's assertion that he was going to be using the arm for recreation was offensive and unfounded. He wrote that he was not going to be able to engage in recreational activities like throwing a baseball with the arm but was instead going to engage in activities like being able to feed himself or open a door in his home.

21. He stated that the list of excluded devices mentioned by DMBA were in no comparable to the robotic arm. He wrote that there were no comparable devices available within the United States. He also pointed out that the summary plan description offered coverage for prosthetic devices for members with any loss of anatomical structure, he contended that offering coverage for this, while denying equivalent coverage for his own condition was a discriminatory act.

22. He asked for relevant information concerning the person who determined his robotic arm should be denied, a description of their familiarity with his diagnosis, and a description of

6

their familiarity with the Jaco robotic arm, including whether they had seen it operate in person.

23. DMBA did not provide this information.

24. On April 13, 2021, Amelia Wilson, PT, DPT, along with Kyle Mahoney, MD submitted a second letter of medical necessity on Sean's behalf. They reiterated that the Jaco robotic arm was a medically necessary treatment for Sean, that it met all of the requirements listed in the insurance policy, and that it was a generally accepted treatment intervention consistent with generally accepted standards of medical practice.

25. They wrote that the Jaco robotic arm had been prescribed by numerous medical professionals in a variety of different disciplines from neurologists to physical therapists. They pointed out that the medical professionals who had prescribed the Jaco arm had over thirty specializations between them and had more than fifteen board and professional certifications.

26. They provided a list of more than fifty different insurers who had provided coverage for the Jaco robotic arm within the last two years.

27. They wrote that this was the most appropriate device for Sean and that it would help to lessen his pain and risk of injury as well as mitigate the other effects of his disability. They wrote that the Jaco robotic arm had been found to be particularly effective for the treatment of Sean's condition, and in fact individuals with Sean's condition represented the largest population of current Jaco users.

28. They wrote that Sean did not have the physical capacity to utilize traditional orthotics or mobility aids and neither of these "would allow Sean to accomplish even a fraction of tasks he could achieve with the Jaco assistive robot."

29. They stated that the device was found to be medically necessary by Sean's treatment team, was clinically appropriate, was the most cost-effective treatment for Sean and was also a one time expense, was not for convenience or recreation, was not excluded by the insurance plan, and no alternative treatment was available which would provide similar results.

30. In a letter dated June 4, 2021, DMBA upheld the denial of payment under the following justification:

> For reasons set out below, CRC[1] has determined that benefits being requested are contrary to the Plan's guidelines and limitations and are not covered by the Plan. The original denial is upheld.
>
> **References to Applicable Medical Plan Provisions:**
>
> *2021 Deseret Value Summary Plan Description*
> DURABLE MEDICAL EQUIPMENT (pg. 5)
>   Covered equipment:
> - Medical equipment or tools prescribed by your healthcare provider that are used repeatedly, serve a medical purpose, and are not useful to people in the absence of illness, injury, or congenital defect.
> - You must preauthorize some medical equipment.
>
> *2021 Deseret Value Legal Plan Document* (LPD)
> Section I Definitions (pgs. 1, 7, & 8)
>   The following words and phrases, when capitalized, shall have the meanings stated below unless a different meaning is clearly apparent by the context. Any capitalized words not defined herein shall have the meanings ascribed to them in any other document evidencing the Welfare Plan.
>     1.48 <u>Medically Necessary.</u> The Plan pays benefit only for Services that are determined by the Plan Administrator to be medically necessary and covered by the Plan. To be considered "medically necessary," a Service must:
>     (a) be [sic] used for the purpose of evaluating, diagnosing, direct care and treatment
>     (b) Be in accordance with generally recognized and accepted standards of good medical practice;
>     (c) ==Be the most appropriate level of Service;==

---

[1] Identified earlier in the letter as the claims review committee.

(d) Be recognized as an accepted and effective medical practice for the treatment of the Covered Individual's Condition or Injury and have received any governmental approval;
(e) not [sic] be primarily for the convenience of the Covered Individual or his or her Physician or other Provider[2]
(f) be [sic] within the scope of the medical specialty, education and training of the Provider
(g) be [sic] clinically appropriate, in terms of type, frequency, extent, site and duration
(h) be [sic] appropriate and needed for a legitimate diagnosis or a cost-effective treatment of a Condition; and
(i) not [sic] be significantly more costly than an alternative Service or sequence of Services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that Covered Individual's Condition or Injury.

APPENDIX C
Excluded Expenses (pgs. 55, 56, & 60)

All Services are excluded unless expressly designated as Covered Expenses under the Plan any charges or expenses in connection with the following, as determined by the Plan Administrator, are Excluded Expenses (in addition to any Excluded Expenses described elsewhere in the Plan).

>6. Durable Medical Equipment (DME), Prosthetics, Orthotics and Supplies.
>>6.2. Add-ons or upgrades intended primarily for convenience or upgrades beyond what is Necessary to meet the Covered Individual's legitimate medical needs

>11. Not Medically Necessary

>>11.1 Services, supplies, or drugs not Medically Necessary as defined by the Plan Administrator.

>>11.2 Services, supplies, or drugs primarily for convenience, contentment or other non- therapeutic purposes

DMBA Medical Policy
   *Wheelchair ad* [sic] *Scooters*

Description
Durable Medical Equipment (DME) is equipment that can withstand repeated use, is primarily used for a medical purpose, and is generally not used in the absence

---

[2] Items C and E were highlighted in the original.

of illness or injury. Wheelchairs can be manual, motorized wheelchair, and other power-operated vehicles, also known as scooters, and are considered DME. Most patients who require power-operated vehicles (POV) are totally non-ambulatory and have severe weakness of the upper extremities due to a neurologic or muscular condition.

Customized Wheelchairs
A custom manual wheelchair base is one that has been uniquely constructed or substantially modified for a specific member. There must be customization of the frame for the wheelchair base to be considered customized. A custom wheelchair base is considered medically necessary only if the feature needed is not available as an option to an already manufactured base.

Wheelchair Accessories
- **Anti-tipping devices** needed when curb negotiation is not a concern, as indicated by 1 or more of the following:
    - Above-the-knee amputation
    - Instability in wheelchair
    - Spinal cord injury
- **Arm rest needed**, as indicated by l or more of the following:
    - Desk arm rest needed for close access of wheelchair to table
    - Fixed armrest needed for patient with infrequent transfers
    - Full-length armrest needed for increased arm support, or sit-to-stand positioning
    - Removable armrest needed to facilitate patient transfers
    - Standard (not tubular) armrests needed for upper extremity weight shifts, or patient weighing greater than 200 pounds (90.7 kg)
    - Swing-away or flip-up armrests needed for active spinal cord injury patients, or facilitation of transfers
- **Backrest needed**, as indicated by l or more of the following:
    - Linear or planar backrest to ease child's growth
    - Molded backrest to accommodate clinically important orthopedic asymmetries
- **Casters needed**, as indicated by 1 or more of the following:
    - Casters of 5 inch (12.7 cm) diameter for sports or children's chairs
    - Casters of 8 inch (20.3 cm) diameter (pneumatic or semi pneumatic for rough surfaces or outdoors
    - Casters of 8 inch (20.3 cm) diameter (standard) for smooth surfaces and indoors
- **Cushion needed**, as indicated by l or more of the following:
    - Air-filled cushion, for seating stability
    - Air-filled villous cushion, for heat dissipation and pressure relief
    - Contoured foam cushion (coated or with gel insert), for durability and seating stability
    - Foam cushion (standard)
    - Gel-filled cushion, for heat dissipation

- **Footrest needed**, as indicated by 1 or more of the following:
    - Fixed footrest, when transfers and portability are not concerns
    - Swing-away footrest, for easier transfers and improved portability
- **Headrest needed**, as indicated by I or more of the following:
    - Poor head control
    - Reclining wheelchair
- **Parking locks or parking brakes** needed, as indicated by 1 or more of the following:
    - Brake extension, if patient cannot reach from ipsilateral side (e.g., hemiplegic patient)
    - High-mounted, if needed by patient and do not interfere with transfers
    - Toggle or lever parking locks or brakes (standard)
- **Seat needed**, as indicated by 1 or more of the following:
    - Molded seat, when required to accommodate clinically important orthopedic asymmetries
    - Rigid seat to ease child's growth, or when postural control is preferred and relative heaviness is acceptable
    - Vinyl sling (standard for adults), when postural control or accommodation is not a concern
- **Seatbelt, safety belt, or pelvic strap** needed for safety, or to maintain pelvis in good position in patient with week upper body muscles, upper body instability, or muscle spasticity.
    - Anterior support needed for poor trunk control (e.g., shoulder straps, shoulder retractors, chest straps, vests)
    - Lateral support needed for poor trunk control or scoliosis (e.g., lateral pelvic supports or hip guides, lateral chest pads)
    - Posterior support needed for poor head or neck control (e.g., headrests or head supports)
- **Tires** needed, as indicated by 1 or more of the following:
    - All-terrain tires, for frequent soft or sandy terrain
    - Pneumatic tires, for carpeting or frequent outdoor use
    - Solid rubber tires (standard), for low rolling resistance on flat or smooth surfaces

Powered wheelchair accessories
- **Chin Control mechanism needed**, as indicated by 1 or more of the following:
    - **Chin control**, for patient with chin control who is unable to use joystick
    - **Electronic interface**, if patient has appropriate speech-generating device that can be operated by powered wheelchair control interface
    - **Head control**, for patient with head control who is unable to use joystick
    - **Joystick**, for patient with hand control

- o **Sip and puff control**, for patient with respiratory control who is unable to use other control mechanisms
- **Powered elevating** leg rest needed due to 1or more of the following:
  - o Below-the-knee amputation
  - o Dependent edema
  - o Knee extension contracture
  - o Other clinically important knee joint abnormality
- **Powered recliner or tilt-in-space backrest** needed, as indicated by 1 or more of the following:
  - o Adequate weight shifts require reclined or tilted backrest
  - o Fully erect seating not possible for patient
  - o High risk for pressure ulcer development or skin breakdown
  - o Intermittent catheterization needed for bladder management, and patient unable to independently transfer from wheelchair to bed
  - o Poor endurance
  - o Poor sitting balance
  - o Respiratory needs require reclined or tilted backrest

Exclusions
Miscellaneous wheelchair accessories: Generally a wheelchair accessory/attachment is considered not medically necessary when needed to adapt to the outside environment for convenience, work, or to perform leisure or recreational activities ...

The covered wheelchair accessories are specifically stated in the Medical Policy as outlined above. The Committee understands the Jaco Robotic Arm would be beneficial for you, however, this type of an accessory is not a covered benefit of the Plan. The Committee upheld the original denial.

31. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

32. The denial of benefits for Sean's treatment was a breach of contract and prevented him from obtaining a medically necessary treatment apparatus which should have been covered under the terms of the insurance policy.

## CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

33. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as

DMBA, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

34. DMBA and the Plan failed to provide coverage for Sean's treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

35. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

36. DMBA and the agents of the Plan breached their fiduciary duties to Sean when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in Sean's interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, and to provide a full and fair review of Sean's claims.

37. The actions of DMBA and the Plan in failing to provide coverage for Sean's medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

38. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.     Judgment in the total amount that is owed for Sean's medically necessary treatment under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

DATED this 17th day of May, 2022.

By    s/ Brian S. King
      Brian S. King
      Attorney for Plaintiffs

County of Plaintiffs' Residence:
Salt Lake County, Utah.